AO 91 (Rev. 11/11) Criminal Complaint



CLERK'S OFFICE
A TRUE COPY
Nov 21, 2024
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| United States of America<br>v.<br>DANTE R. MCDONALD<br>(xx/xx/1979)<br><br>*Defendant(s)* | Case No. **24-M-543 (SCD)** |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  April 2024 to present  in the county of  Milwaukee  in the  Eastern  District of  Wisconsin , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 846 | Conspiracy to possess with intent to distribute 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine |
| Title 21, United States Code, Section 841(a)(1) | Possession with intent to distribute 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

*Complainant's signature*

Jeffrey R. Milam, Special Agent DEA
*Printed name and title*

Sworn to before me **Telephonically**

Date: 11-21-24

*Judge's signature*

City and state:  Milwaukee, Wisconsin   Stephen C. Dries, Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Jeffrey R. Milam, being first duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the Drug Enforcement Administration and have been since September 2014. Before that, I was employed as a police officer with the St. Louis County Police Department in St. Louis, Missouri, where I spent the last three years as a Task Force Officer with the DEA. During my tenure as a Special Agent, I have been involved primarily in the investigation of large-scale drug traffickers operating not only in the City of Milwaukee and the State of Wisconsin, but also throughout the entire United States based upon the direction of investigations that arise through the Milwaukee District Office of the Drug Enforcement Administration.

2. I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1) and 846 (possession with intent to distribute a controlled substance and conspiracy to possess with intent to distribute a controlled substance), and other related offenses. I have had both formal training and have participated in numerous complex drug-trafficking investigations, including ones using wiretaps. More specifically, my training and experience includes the following:

   a. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

   b. I have also relied upon informants to obtain controlled substances from dealers, and have made undercover purchases of controlled substances;

   c. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

1

d. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

e. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

f. I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations;

g. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

h. I have been assigned to court-authorized wiretaps and have been trained to operate the equipment utilized to conduct such operations;

i. I know that drug traffickers often put their telephones in nominee names in order to distance themselves from telephones that are utilized to facilitate drug trafficking; and

j. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement officials.

3. The information set forth in this affidavit comes from my personal involvement in this investigation, as well as from information provided to me by other law enforcement officers. This affidavit is submitted for the limited purpose of establishing probable cause for the issuance of a criminal complaint against Dante R. MCDONALD for violations of the laws of the United States, that is, conspiring with others, known and unknown, to possess with the intent to distribute a controlled substance, namely five kilograms or more of a mixture or substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A); and possession with intent to distribute a controlled substance, namely five

kilograms or more of a mixture or substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).

## **PROBABLE CAUSE**

4.       On July 31, 2024, at approximately 9:00 a.m., an Effingham County (Illinois) Sheriff's Office deputy was patrolling Interstate 57 near mile post 162. Around this time, the deputy observed a black Chevrolet Suburban, displaying Texas registration: VJC2349 (registered to a Kenneth Beverly), traveling ahead of him. While using a radar and pacing the Suburban, the deputy determined that the Suburban was traveling at 70 m.p.h, which was above the posted 65 m.p.h. speed-limit. The Suburban then changed lanes without signaling at least 200 feet before moving from the left-hand to the right-hand lane. Based on these observed violations of the Illinois Vehicle Code (i.e., speeding and improper use of turn signal), the deputy activated his marked unit's emergency lights to conduct a traffic stop on the Suburban. The driver of the Suburban complied and pulled over at approximately the 164-mile post on Interstate 57.

5.       The deputy communicated with the Suburban's driver, who was identified as Dante R. MCDONALD (DOB: XX/XX/1979). The deputy also observed a front-seat passenger, later identified as Ashley Reiter, and a juvenile female subject, who was later determined to be Reiter's daughter. The deputy observed that Reiter refused to look at him as she immediately proceeded to call someone on her cellular telephone. MCDONALD told the deputy that they were returning home to Wisconsin and that the Suburban belonged to a friend. The deputy asked MCDONALD to come to his marked unit so that he could issue MCDONALD a written warning for the traffic violations. While MCDONALD sat in the marked unit's front passenger seat, the deputy asked MCDONALD how long he lived in Wisconsin. MCDONALD responded that he had lived in Wisconsin his entire life. MCDONALD said Reiter was his friend, and that the female juvenile

3

was Reiter's daughter. When the deputy inquired about the trip, MCDONALD explained that he was traveling from the Dallas, Texas area where they had been visiting Reiter's friends. The deputy noted that the Suburban contained very little luggage, which he believed was odd given MCDONALD's explanation that they had been on a cross-country trip.

6. As the deputy was preparing MCDONALD's written warning, a canine-enforcement officer had his state-certified narcotics-detecting K9 "Siren" conduct a free-air sniff of the Suburban. K9 "Siren" alerted to the odor of narcotics emanating from inside the Suburban. When the deputy told MCDONALD that K9 "Siren" alerted to the Suburban and then asked him if the vehicle contained anything illegal, MCDONALD responded that the Suburban contained nothing illegal. The deputy told MCDONALD to remain in the deputy's marked vehicle while he and other officers conducted a search of the Suburban.

7. An initial search of the Suburban yielded no contraband inside the vehicle's open areas. Upon closer inspection, however, the officers observed post-manufacture tampering inside the Suburban. Specifically, when the officers pulled back the carpet beneath the third-row seats, they found a jagged-cut panel with hinges and wiring. Based on their training and experience, the officers believed they had found the access to a post-manufacture concealed compartment. When an officer used a borescope to reveal the contents of the concealed compartment, he observed several vacuum-sealed rectangular packages, which appeared to be kilogram-quantity packages of illegal drugs. The officers subsequently transported the Suburban to a nearby towing company where the officers opened the Suburban's post-manufacture concealed compartment and recovered 15 numbered vacuum-sealed packages, each weighing approximately a kilogram and each bearing an "811" stamp. The 15 kilogram-sized bricks contained a white, powdery substance that field tested positive for the properties of cocaine.

4

8. Investigators conducted a post-*Miranda* interview of MCDONALD while he was inside the deputy's marked unit. MCDONALD said he had driven from Haslet, Texas (a city within the Dallas-Fort Worth metroplex), where he and Reiter had been visiting friends. MCDONALD said Reiter has accompanied him on previous trips to Texas because Reiter would visit family there. MCDONALD said on either July 27 or July 28, 2024, they had visited a residence located at 1820 Lavin Plaza, Haslet, Texas. MCDONALD said they left Texas the previous day (i.e., July 30, 2024), and were *en route* to Wisconsin when they decided to spend the night at the Days Inn Hotel, room 210, in Effingham, Illinois. MCDONALD said that although the Suburban belonged to someone else ("Kenneth Beverly"), he drove it often, he would keep it for extended periods of time, and would occasionally make the monthly payments on the vehicle. MCDONALD was reluctant to provide further details about his trip to Texas.

9. Investigators took MCDONALD to the Effingham County Jail where they resumed a post-*Miranda* interview of him. MCDONALD said his current address was 3817 North Sherman Blvd., Milwaukee, Wisconsin 53216. He said he had left Milwaukee, Wisconsin late the previous Saturday and had arrived in Texas on Sunday. MCDONALD denied knowledge of the cocaine concealed inside the Suburban. He said that had he been aware of the concealed compartment, he would have told investigators how to open it. MCDONALD initially indicated that he only drove the Suburban periodically, but later admitted to driving the Suburban all the time. He said he did not have any other vehicle.

10. MCDONALD said he had traveled to Texas approximately ten times over the past couple years, and that he had driven the Suburban to Texas about four to five times. He said that he had been traveling to Texas once per month over approximately the past three months. MCDONALD explained that during his last Texas trip, he left the Suburban at the residence

5

located at 1820 Lavin Plaza, Haslet, Texas. He said he later retrieved the Suburban from the Haslet, Texas residence, and then drove it to another residence in Glenn Heights, Texas. He said he subsequently departed the Glenn Heights residence in the Suburban to return to Wisconsin. MCDONALD said he is typically instructed to park the Suburban at a tire shop, located on N. 35th Street and W. Center Street in Milwaukee, Wisconsin when he returns to Wisconsin from Texas.

11. MCDONALD initially said he was not compensated for his trips to Texas, but later admitted to receiving $1,000 to drive from Wisconsin to Texas and back. He said "people" at the tire shop paid him, but he refused to elaborate. At one point, when discussing the Milwaukee tire shop, MCDONALD remarked that he thought "it" would be in the tire. MCDONALD said he also took "it" to a residence in Brown Deer. When pressed to clarify what he meant by "it," MCDONALD refused to elaborate and ended the interview. Based on training and experience, your Affiant believes "it" was a reference to the contraband, i.e., cocaine, that MCDONALD had transported from Texas.

12. Based on the facts detailed above, your Affiant believes that MCDONALD traveled to Texas from Milwaukee, Wisconsin to retrieve kilogram quantities of cocaine, which were concealed in a post-manufacture compartment in the Suburban. Your Affiant further believes once the cocaine was concealed inside the Suburban, MCDONALD intended to return with cocaine to Milwaukee, Wisconsin, where it would be further distributed.

13. Accordingly, your Affiant submits there is probable cause to believe that Dante MCDONALD, in the Eastern District of Wisconsin and elsewhere, conspired with others, known and unknown, to possess with intent to distribute a controlled substance, namely five kilograms or more of a mixture or substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A); and possession with intent to

distribute a controlled substance, namely five kilograms or more of a mixture or substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).